FORD *v.* TAYLOR.

## Opinion delivered April 2, 1928.

1. BANKS AND BANKING—DUTY OF DIRECTORS.—While bank directors are liable to stockholders as well as creditors for failure to exercise diligence and good faith in managing the affairs of the bank, the mere exercise of poor judgment is not sufficient to form a basis for liability.

2. BANKS AND BANKING—LIABILITY OF DIRECTORS.—Where directors of a bank met regularly and kept their records properly and were unaware of the precarious condition of the bank before examination by a bank examiner, they are not liable, on the bank's insolvency, for losses sustained as a result of bad loans and depreciation in values, notwithstanding the exercise of bad judgment in making loans.

3. BANKS AND BANKING—DUTY OF DIRECTORS.—Where the report of a bank examiner disclosed that a bank was in a precarious condition at the time such report was filed, the directors were required to give closer attention to the bank's affairs than they had previously done.

4. BANKS AND BANKING—LIABILITY OF DIRECTORS.—On a bank's insolvency its directors *held* not liable for worthless loans made by way of renewal of loans given at a time when the directors were not aware of the bank's precarious condition, or for money borrowed from correspondent banks without the directors' knowledge, where the original loans resulted from bad judgment only, and the bank received the benefit of money obtained from correspondent banks, though such money was obtained by use in part of forged collaterals as part of the cashier's mismanagement of the bank's affairs.

5. BANKS AND BANKING—LIABILITY OF DIRECTORS.—Bank directors, when informed by the report of the bank examiner of the precarious condition of the bank, who nevertheless failed to appoint a discount or loan committee or to supervise loans made by the cashier or to require reduction of excessive liability of officers to the bank, *held* liable for worthless loans subsequently made by the cashier and for aditional loan to the bank's president, since such losses were due to the failure of the directors to exercise diligence in managing the bank's affairs.

Appeal from Franklin Chancery Court, Ozark District; *J. V. Bourland,* Chancellor; reversed.

*Webb Covington, J. D. Benson* and *G. C. Carter,* for appellant.

*Hill, Fitzhugh & Brizzolara,* for appellee.

SMITH, J. This suit was brought by the State Bank Commissioner against the directors of the People's Bank of Ozark. The complaint alleged that the bank had become insolvent, and that the plaintiff commissioner had taken over its affairs, and, through a partial liquidation of its assets, had paid a dividend of ten per cent. to its creditors, and that the bank had become insolvent through the failure of the defendant directors to discharge the duties imposed upon them by law as directors.

The complaint alleged that the directors failed and neglected to discharge their duties in the following respects: At the first meeting of the board in January, 1925, the directors ordered that the policy of the bank should be to make no further loans except small loans to regular customers in the due course of business, and the directors so instructed F. E. Stockton, the cashier. This order was made because the bank at the time was in a badly extended condition, with a large amount of frozen assets and past due paper, but, notwithstanding this condition, the directors, through lack of ordinary care and prudence, permitted the cashier to make many new loans, several of them being in large amounts, and without adequate collateral, and to irresponsible persons. A list of these loans, aggregating $42,695.02, was set out. It was further alleged that a number of these alleged loans were evidenced by notes to which the names of the makers had been forged by the cashier, and that this practice could not have proceeded far if the directors had discharged their duty by examining the notes.

That on February 12, 1925, the board of directors adopted a resolution authorizing the cashier and other officers of the bank to borrow money from the City National Bank of St. Louis, the Merchants' National Bank of Fort Smith, and the Bankers' Trust Company of Little Rock, and to pledge the notes held by the bank as collateral therefor, but, instead of this resolution being correctly entered upon the minutes of the meeting of the directors, the cashier entered a resolution giving him authority to rediscount notes held by the bank as

security for loans made by it with any of the correspond-
ent banks, and, by reason of the failure of the directors
to see that this resolution was properly entered, the
cashier was enabled to obtain large sums of money, which
he dissipated in reckless and unauthorized loans. At
the time of the trial of this cause in the court below liti-
gation was pending in which liability to the St. Louis
bank was denied on account of notes rediscounted to the
St. Louis bank, but that case was recently determined
by this court in favor of the St. Louis bank. *Grand
National Bank of St. Louis* v. *Taylor,* 176 Ark. 1, 1
S. W. (2d) 818. That the cashier of the bank erected
a business house in Ozark in 1925, and paid the contrac-
tor for his work by permitting the contractor to over-
draw his building account, and that these overdrafts
were carried as bills receivable on the books of the bank,
and in this manner the bank sustained a loss of
$9,673.07. That the directors were negligent in permit-
ting and approving loans to the president of the bank
and to a brother and a son of the president, and testi-
mony was offered tending to show that all these loans
were in fact loans to the president, but were made to
the president's brother and son to prevent it from appear-
ing that the loan limit to any one person had been
exceeded.

In response to a motion to make the complaint more
definite and certain, an amendment to the complaint was
filed, in which it was alleged that the nominal assets
which came into the hands of the Bank Commissioner
amounted to $550,000, but included in this amount was
$67,072.38 of old notes which had been previously charged
off as being of no value, and $150,000 of other assets
which were without value, and $30,000 in duplicated
notes, leaving total assets of $302,927.61, of which
$90,000 had been collected, and it was estimated that
$90,000 more would be collected. The actual liabilities
of the bank were alleged to be $480,499, and the con-
tingent liabilities were $150,000.

A demurrer to the complaint was overruled, as was also an additional motion to make the complaint more definite and certain.

The answer filed by the defendant directors denied that they had failed to exercise ordinary care in the matter of seeing that the directions given by them to the cashier were obeyed in the matter of making new loans, and they alleged the fact to be that the cashier was a man in whom they and all others had implicit faith and confidence, and whose good character was unquestioned either for business capacity or integrity. That the cashier had forged the resolution increasing his authority to obtain money from the correspondent banks, and had kept the books of the bank, including the note register, in such manner that they did not know of the unauthorized loans or the forged notes which had been used as collateral to borrow money. They were not aware that the cashier of the bank was using the funds of the bank in an unauthorized way in the construction of a business house, and could not by ordinary care have discovered that fact. The loans to the president of the bank were alleged to have been made at a time when his solvency was not questioned, and it was further alleged that he was solvent, and that the loans to the brother and son of the president were made in good faith and in the exercise of an honest judgment as to the solvency of these parties. The testimony appears, however, to show that the president of the bank is not solvent, at least the Bank Commissioner has been unable to collect from him the amount due the bank.

All the allegations of the complaint were put in issue, including the allegations as to the value of the assets which the Bank Commissioner had taken over and those in regard to the actual and contingent liabilities of the bank.

A voluminous record was made at the trial from which this appeal comes, and this opinion would be wearisomely protracted if we were to discuss all the notes

and transactions upon which the liability of the directors is predicated. We will content ourselves therefore with a declaration of the legal principles which should be applied, and the liability of the directors will be accordingly determined.

We have had frequent occasion to consider the liability of directors of banks to stockholders as well as creditors for inattention to their duties and for the mismanagement of the bank's affairs, and a late case is that of *Muller* v. *Planters' Bank & Trust Co.,* 169 Ark. 480, 275 S. W. 750. This case cited and to some extent reviewed the leading cases in this State on this subject, and in the syllabus in that case it is said: "While bank directors are liable to stockholders as well as creditors for failure to exercise diligence and good faith in managing the affairs of the bank, the mere exercise of poor judgment is not sufficient to form a basis of liability."

In the body of the opinion in that case it was said:

"The statute, however, in broad terms, as we have seen, places the 'stock, property, affairs and business of such corporations' under the care of their board of directors, to be managed by them. The statute creates a relation and confers a power which necessarily carry with them corresponding duties and liabilities, independent of any statute specifically defining or limiting those duties and liabilities; and in the absence of any statute they must be ascertained and controlled by common-law rules applicable generally to such relations and powers.' The court then adopted the rule announced by Mr. Justice Harlan in the case of *Briggs* v. *Spaulding,* 141 U. S. 132, 11 S. Ct. 924, 35 L. ed. 662, as follows: 'Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision over its officers. They have something more to do than, from time to time, to elect officers of the bank, and to make declarations of dividends. That which

they ought, by proper diligence, to have known as to the general course of business in the bank, they may be presumed to have known, in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business. * * * A rule no less stringent should be applied as between a banking association and directors representing the interests of stockholders and depositors.' The substance therefore of the test laid down in that case of the responsibility of directors to stockholders as well as to creditors, is good faith and diligence.''

Testing the liability of the directors by these rules, we find that they were grossly negligent in the performance of their duties as directors from and after the first of January, 1925.

The testimony shows that an examination of the bank was made about that time by an examiner of the State Banking Department, and it was a mere matter of indulgence on the part of the examiner that the bank was permitted to continue in business. Copies of this report were filed with both the Bank Commissioner and the directors of the bank, and the most casual examination of this report would have shown that the bank was then in a most critical condition.

With a capital of only $25,000, the president of the bank was liable to it upon two notes totaling $11,020.17, and as an indorser upon the note of his brother for $3,405.15, and the maker of this note testified that the cashier told him that the bank was carrying the president for more than the bank rules would permit. ''He asked me if I would take part of it. That is how I took it.'' The officers and employees of the bank were carrying loans with the bank, including their indorsement, of $24,899.27. The total loans of the bank, as shown by the examiner's report, amounted to $276,675.10, and included therein were 569 past due notes totaling $165,-853.56, and $16,928.83 in notes were carried as cash items, and there was a deficit in the reserve of 11.5 per cent. The report called attention to the fact that the

practice of permitting overdrafts appeared to be habitual, and that these were carried as cash items, and the attention of the directors was also called to the fact that the bank's other paper was not fairly or sufficiently liquid.

Notwithstanding these facts, we are of the opinion that the directors of the bank are not liable for any losses sustained by transactions occurring before this examination by the bank examiner. Prior to that time the directors were not aware of the precarious condition of the bank; they had met regularly, and had kept their records properly, and had a discount committee which had functioned, and the directors had made an audit of the bank's affairs in the year 1924. The honesty of the directors themselves is not called in question, and it is charged only that they were grossly inattentive to their duties. Most of the loans then existing were renewals of old loans made in more prosperous times and to persons who were regarded as good when these loans were made. A crushing depreciation in values had occurred, which rendered many persons unable to pay whose paper had been previously regarded as good. The directors had evidently used poor judgment in making many of these loans, but, as was said in the Muller case, *supra,* "the mere exercise of poor judgment is not sufficient to form a basis of liability, for, when directors are selected by the stockholders, the latter assume the risk of losses occurring on account of mere defects in judgment, and in acceptance of the office by the director he merely assumes the obligation to manage the affairs of the institution with diligence and good faith."

But, as we have said, the directors must have known from the report of the bank examiner, if not otherwise, that the bank was in a precarious condition when the examiner's report was filed with them on January 4, 1925, and under these circumstances diligence and good faith required them to give closer attention to the bank's affairs than they had previously done.

In discharge of this duty the directors, at their meeting in January, 1925, directed the cashier to make no new loans except small ones to regular customers in the ordinary course of business. It appears, however, that no intelligent or serious effort was made to enforce this rule. It may be said, in this connection, that the record does not show any criminal conduct on the part of the cashier prior to 1925, and that the directors and the community generally had implicit confidence in the cashier's integrity prior to that time. But with the beginning of this year the cashier commenced a systematic misuse of the bank's funds. He purchased an eighty-acre tract of land in the city limits, and he erected a house costing five or six thousand dollars, and he erected a ten-thousand-dollar business house on one of the principal streets. In addition to this, he engaged in oil ventures; he operated a coal mine; he invested in a diamond cave, and assisted in promoting a vineyard company and a life insurance company, and in aid of these projects he made large and unauthorized loans to himself and to the persons associated with him. In the erection of his business house he directed the contractor to draw against a small account the contractor had with the bank, and these overdrafts were carried as cash items. The directors admitted knowing that the cashier was erecting the building, but they testified that they supposed the money for this purpose had been derived from a loan obtained from a building and loan company, which, however, was not the fact.

The directors made no audit of the bank's affairs during the year 1925, and had no discount or loan committee. The directors testified that the entire board acted as a discount or loan committee, but it appears that the cashier made no report on loans until they had been made, and the directors testified that they would have authorized such loans as were reported to them had application therefor been previously submitted to them. Most of the important loans, however, were never sub-

mitted to the directors, and the cashier's practice was to conceal questionable and unauthorized loans by giving them the same numbers possessed by smaller and unimportant loans made to persons to whom the directors would have made loans had they been requested so to do.

The cashier commenced the practice and continued it throughout the year 1925 of forging notes to the order of the bank, which he rediscounted with the correspondent banks, · which transactions were without the knowledge of the directors. The practice of the cashier in this respect was detailed in the opinion of this court in the case of *Grand National Bank of St. Louis* v. *Taylor, Bank Commissioner, supra,* in which case we held that the bank was liable for the rediscounts so made. It appears, however, that the bank actually received the proceeds of these rediscounts, so that no liability could be predicated upon the transactions themselves. The liability, if any, arises out of the disposition of the funds thus obtained.

It appears that the directors not only did not make an audit of the bank's affairs during the year 1925, as the rules of the Banking Department required them to do, but no director ever made any examination of the notes taken by the bank; indeed, they did not even examine the note register, but contented themselves by listening to the cashier read from a prepared statement a list of the loans he had made. The directors failed entirely to hold one monthly meeting, and no minutes of any meeting after September were ever written up, or approved or signed by the board or its officers.

The directors appeared to have made no effort to require the president of the bank to reduce his own indebtedness to the bank, but actually permitted him to increase his liability from January to September by three thousand dollars.

The directors insist that no supervision on their part would have enabled them to know the corrupt and criminal practices of the cashier, as he was falsifying his

records and forging paper. But it may be said, in answer to this contention, that the cashier's criminality did not consist of a single or only a few transactions and entries, but was a systematic course of conduct which he no doubt felt free to pursue without fear of detection by the directors through their failure to discharge the functions of their office. The peculations of the cashier were so open that detection must have resulted from any reasonable attempt at supervision. Had the directors exercised good faith and reasonable diligence, the cashier would soon have been detected in his practice of making unauthorized loans and rediscounting forged notes with correspondent banks.

We do not hold that the directors were insurers of the honesty or good faith of the cashier, or that they became liable for his fraudulent conduct simply because they were directors, for such is not the law as announced in the prior decisions of this court, cited in the Muller case, *supra*. But we do hold them liable for their lack of diligence and good faith in supervising the affairs of the bank. Their inattention to the bank's affairs furnished the cashier assurance that the boldest and most flagrant conduct on his part would escape their detection and give the cashier an opportunity to loot the bank systematically.

The court below made a finding in favor of the Bank Commissioner on each count of the complaint, including a count added at the conclusion of the testimony, which was added to conform to the testimony, and a judgment was rendered against the directors accordingly.

The decree must be reversed, because the court held the directors liable for certain worthless loans made by way of renewal of loans made prior to 1925, and also for certain money borrowed from the correspondent banks without the knowledge of the directors. We think the decree must be reversed in these respects because the loans made prior to 1925 and the renewals of such loans appear to have resulted from bad judgment only, and the

money obtained from the correspondent banks was credited to the account of the bank on the books of the bank. In other words, the bank received the benefit of the money obtained from the correspondent banks, although that money was obtained by the use, in part, of forged collaterals.

Without discussing in detail the various transactions through which the bank sustained losses and for which the Bank Commissioner seeks to hold the directors liable, we announce our conclusion to be that the directors should be held liable only for the loans made after January 1, 1925, to the cashier and his associates in their enterprises, including the overdrafts of the contractor incurred in the erection of the business building, and the three thousand dollars increase in the president's indebtedness after the beginning of 1925. These losses would not have been sustained had the directors, in good faith and in the exercise of ordinary diligence, enforced the resolution adopted in January, 1925, which was intended to prevent just such loans being made. This liability should, of course, be credited with any collections made on account of these loans.

The decree of the court below will therefore be reversed, and the cause remanded with directions to enter a decree fixing the liability of the directors and ascertaining the amounts thereof, in accordance with this opinion.