STERNBERG *v.* BLAINE.

Opinion delivered April 29, 1929.

*James G. Coston* and *J. T. Coston,* for appellant.
*Emil Rosenberger* and *Little & Buck,* for appellee.

MEHAFFY, J.  This action was instituted in the Mississippi Chancery Court by appellants, who were creditors of the Bank of Blytheville, against J. C. Blaine and others, directors of said bank, to recover on account of the alleged negligence of the directors.  Suit was also brought by the Grassy Lake & Tyronza Drainage District No. 9 and Eva Johnson, administratrix, against the directors.  The suits were consolidated, and actions were discontinued as to all defendants except Blaine.

The Bank of Blytheville was organized some time about 1900, and it was closed by the Bank Commissioner on March 10, 1920.  J. G. Sudbury was president of the bank prior to the time that Blaine became a director.  Sudbury died in November, 1918, and on January 13, 1919, J. C. Blaine was elected director.  Blaine was a nonresident of the State, his home being at Wellsville, Missouri.  Blaine was a man 70 years of age; had business interests in Blytheville, and owned property there, and his business there took him to Blytheville regularly once a month, and sometimes twice a month.

J. G. Sudbury, who had formerly been president and manager of the bank, was a man of unquestioned integrity, and had active charge of the affairs of the bank prior to the time Blaine became a director.  All of the directors and persons in charge of the bank at the time Blaine became a director were men of good reputation, regarded as honest and competent.

The Bank of Blytheville was regularly examined by examiners from the Banking Department, and no irregularities were ever discovered, and the bank was apparently in good condition and prosperous at the time Blaine became a director.  On the 10th of March, when the Bank Commissioner took charge of the bank, it was not only insolvent, but the audit made under the direction of the bank examiner disclosed the fact that the cashier and assistant cashier had, during the last three years, stolen approximately $800,000.  They had permitted overdrafts for large sums of money, and these

overdrafts were not shown on the records of the bank, but were deposited in a box in the vault. There was nothing in the bank records anywhere to indicate that these overdrafts existed, or that the cashier or assistant cashier had stolen any money. In some instances, when they had stolen money, they would charge the amount stolen to some depositor, indicating on the records that the depositor had drawn a check and that the money had been paid to him. If the depositor thereafter called for a statement of his account or asked that his book be balanced, this erroneous charge would not show on his statement or on his book, but his statement would show a correct balance. This system had been going on for at least three years, and had never been discovered by the bank examiner or any one else. The cashier and assistant cashier did not keep their records up, but kept them two or three days behind, but, if the bank examiner came, they would bring the books up to date, and they were so prepared as to show no irregularities, no thefts, and no overdrafts, except what would be usual in a bank of this kind.

Blaine and the other directors met monthly, and would pass on the notes and collateral and make such examinations as are usually made by directors of banks of this kind, and there was nothing shown on the books of the bank to indicate any mismanagement or any thefts.

Blaine attended all the meetings of the directors after his election, except four or five. At the time those meetings were held he was absent either because of sickness of himself or his wife.

The case of *Creamery Package Co.* v. *Wilhite,* 149 Ark. 576, 233 S. W. 710, was a suit involving the negligence and carelessness of Blaine and other directors of the Bank of Blytheville, but the court held in that case that the appellants failed to show any right on their part to maintain the suit, and that, for that reason, a demurrer was properly sustained. The complaint in that case,

however, sets out the acts which it is alleged constituted the negligence.

The law applicable to the instant case is well settled by the decisions of this court. This court has said:

"The court then adopted the rule announced by Mr. Justice Harlan in the case of *Briggs* v. *Spaulding*, 141 U. S. 132 (11 S. Ct. 924), as follows: 'Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision over its officers. They have something more to do than, from time to time, to elect officers of the bank, and to make declarations of dividends. That which they ought, by proper diligence, to have known as to the general course of business in the bank, they may be presumed to have known, in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business. * * * A rule no less stringent should be applied as between a banking association and directors representing the interests of stockholders and depositors.' The substance therefore of the test laid down in that case, of the responsibility of directors to stockholders as well as to creditors, is good faith and diligence. The mere exercise of poor judgment is not sufficient to form a basis of liability, for, when directors are selected by the stockholders, the latter assume the risk of losses occurring on account of mere defects in judgment, and in acceptance of the office by the director he merely assumes the obligation to manage the affairs of the institution with diligence and good faith." *Muller* v. *Planters' Bank & Trust Co.*, 169 Ark. 480, 275 S. W. 750. See also *Bank of Commerce* v. *Goolsby*, 129 Ark. 416, 196 S. W. 803.

There are numerous Arkansas cases cited by the court in the opinion of the above case, showing that the rule is well established in this State that the directors are liable for failure to use diligence and good faith.

The rule was again announced by this court in *Ford v. Taylor*, 176 Ark. 843, 4 S. W. (2d) 938. It may therefore be stated as the settled rule in this State that any failure of a director to exercise diligence or good faith which results in loss to a stockholder or creditor, entitles such stockholder or creditor to require the directors whose negligence have caused the loss to pay. In other words, the director whose negligence causes loss is liable for such loss to stockholders and creditors.

It was, however, said in the last case cited that the directors of a bank are not liable for any losses sustained by transactions occurring before the examination by the bank examiner, because, prior to that time, the directors were not aware of the precarious condition of the bank; they had met regularly and kept their records properly, and had a discount committee which had functioned, and the directors had made an audit of the bank's affairs in 1924.

Keeping in mind the rules above announced, the question of the liability of Blaine must be determined by the evidence in the case. If the preponderance of the evidence shows that Blaine was guilty of negligence which caused a loss or resulted in a loss, he would be liable for the amount of the loss due to his negligence or his failure to exercise ordinary diligence with reference to the management of the bank.

It is not contended that Blaine was dishonest, or that he had any intention of doing wrong, but it is earnestly contended by learned counsel that he was guilty of negligence in failing to discover that the cashier and assistant cashier were stealing money from the bank. It is said that, if Blaine did not know the condition of the bank, he could have known it by the exercise of ordinary care, and that the exercise of ordinary care would at least have disclosed conditions that would have aroused his suspicion and caused him to make further inquiry, whereby he would have discovered the shortage.

454

Ordinary care means such care as a man of ordinary prudence would exercise under similar circumstances. When Blaine became a director of the bank, all of the other directors had been managing the bank for a long while, and were regarded as men of honesty and integrity, and there was no suspicion about the dishonesty of any of them. They lived at Blytheville, and Blaine lived in Missouri, and the evidence does not show that anything had occurred or had been brought to Blaine's attention to arouse the suspicion of any one. It is urged that, when Wilhite and Anthony, the cashier and assistant cashier, were speculating and making deals, they required large sums of money, and that these facts should have aroused the suspicion of Blaine and caused him to make investigation. These transactions, however, began two or three years before Blaine had any connection with the bank, and there is no evidence that Blaine had any knowledge of these transactions or ever heard of them. Besides, the evidence shows that they were supposed to have made large sums of money; but, whether they made money or lost money by these transactions, there is no evidence that Blaine, who lived in Missouri, ever heard of them. Moreover, these transactions were alleged to have taken place at the time when Mr. Sudbury was president of the bank and Judge Taylor was a director, and it is conceded that both these men were men of character and ability and that there was never any suspicion of wrongdoing on the part of either of them. They were at the time managing the bank.

It is also urged that the overdrafts of Anthony and Wilhite should have been discovered by Blaine, and, if discovered, would have aroused his suspicion and caused an investigation to be made that would have disclosed the thefts by these parties. Most of these drafts were kept in a box in the vault, and there was nothing on the record to show anything about these overdrafts. One of the drafts for $179,736.32 was an overdraft or shortage of Jim Reese. It appears from the testimony of Mr. Moore

that this Reese draft was not disclosed by the record; that it was found in the box in the vault, and that there was no record of any of the checks being entered on the bank books. There was then no possible way that the examination usually made by directors would have discovered the Reese shortage.

The evidence also shows that the cashier and assistant cashier would take money of the bank and then charge to the account of depositors enough money to make their books balance, and that, instead of showing any irregularity or misconduct on their part, the books would show that the money which they had stolen had been drawn out by depositors. If a depositor, whose account had been charged with money that he did not get and had not drawn a check for, called for his statement, or for his book to be balanced, his book would be balanced, showing a correct balance, and this charge which was made to cover up their theft would not appear on his statement. No ordinary examination usually made by directors of a country bank, however careful, would have discovered these things. And the auditor, Mr. Moore, states that these things could have been discovered if there had been no dishonesty, but admits that the dishonesty and false records would have prevented a discovery of the theft by an ordinary examination, and, in order to discover them, that an audit would be necessary.

It is also urged that the discrepancies between the cashbooks should have been discovered, and caused an investigation or an audit of the books. This would be true if the shortage was indicated by the books, but, when the books were examined by the directors and examined by the bank examiner, there was no shortage shown. This bank had been regularly examined by the bank examiner, and the different bank examiners had failed to discover the theft, or any irregularities, or any suspicious circumstances that would cause them to require a further examination or an audit of the books.

456

It is argued by learned counsel that the method of examination by the bank examiners was a sham, and that the evidence does not show that they failed to discover, but simply shows they failed to report it. There is no evidence that there was any dishonesty or carelessness on the part of the bank examiners; but, even if there was, certainly there is no evidence tending to show that Blaine knew anything about this. And, while a failure of the bank examiner to perform his duty did not excuse the directors from the performance of their duties, yet the fact that it was examined regularly by the bank examiners is a circumstance tending to show that the directors were not negligent in the performance of their duties.

The testimony is quite lengthy, and, while Moore and one or two other witnesses testify that the discrepancies should have been discovered by the exercise of ordinary care, still they admit that, if the money was stolen and covered up in the manner in which the bank examiner testified that it was covered up, it would have required an audit of the books, and that it could not have been discovered by an examination of the books.

It would serve no useful purpose to discuss each question separately. There is no dispute about any principles of law. As we have already said, the law applicable to this case has been settled by repeated decisions of this court to the effect that bank directors must exercise diligence and good faith. That means such diligence and such good faith as would characterize the conduct of a man of ordinary prudence.

In the absence of any reason to suspect the honesty of the cashier, there is no duty upon the directors to do more than is ordinarily done by directors of a bank of this kind. A bank director is not required to be an expert nor a competent bookkeeper, nor to do more in the general management of the bank, with reference to its cashier and bookkeeper, than to see that the statements made to the board correspond to the books, unless there is some reason for doubting the fidelity of the trust confided to

the cashier or bookkeeper. Knowledge of all the affairs of the bank cannot be imputed to a director for the purpose of charging him with liability, unless there is something about the conduct of the cashier or bookkeeper or about the affairs of the bank that would arouse the suspicion of a man of ordinary prudence.

We do not think that the overdrafts that showed on the books of the bank, nor the borrowing of money, under the circumstances, would have been any notice that there was anything wrong with the management of the bank's affairs or that would have required anything more than the examination usually made by directors.

Applying these principles of law, does the evidence show that Blaine was negligent in the performance of his duty as a director? Sudbury, Taylor and others who managed the bank were men of integrity and of good business judgment. They were interested largely in the bank as stockholders. No one doubts their honesty or business ability. They had failed to discover anything wrong or irregular in the bank's affairs. The State Bank Examiner had examined the bank frequently, and found nothing wrong. The books of the bank showed that it was in a prosperous condition. What was there, then, to arouse the suspicion of anybody who had a knowledge of all these facts?

It is urged that the bank examiner who went there on March 10 did discover the shortage of approximately $27,000. That is true; but, if he had permitted the cashier or assistant cashier to bring the books up to date, instead of doing it himself, he would not have discovered the shortage probably, and it was usual to let the officers of the bank bring the books up to date. Again, they had probably continued their thefts about as long as it was possible for them to do, or at least Anthony thought they had, and he had concluded to disclose the truth to the bank examiner.

As we have said, the decision of the case depends upon the evidence, and, while chancery cases are tried

458

*de novo* here, yet it is a well-established rule of this court that the findings of the chancellor, unless against the preponderance of the evidence, will be sustained.

The findings of the chancellor in this case are not against the preponderance of the evidence, and the decree is therefore affirmed.

HART, C. J., (dissenting). In a case-note to 2 A. L. R., page 871, it is said that the directors of a commercial bank are liable for defalcations of its executive officers or employees, due to their want of reasonable care. Among the cases cited is *Campbell* v. *Watson,* 62 N. J. Eq. 396, 50 Atl. 120, where the rule itself and the reasons for it are stated in a clear and comprehensive opinion, containing a review of the authorities by Pitney, V. C., who afterwards became a justice of the Supreme Court of the United States and was recognized as one of its most valued members. The case of *Fletcher* v. *Eagle,* 74 Ark. 585, 86 S. W. 810, 109 Am. St. Rep. 100, was also cited, where it was held that the directors are not justified in committing the entire control of the bank to the president, however honest and faithful they believe him to be.

The opinion of the majority recognizes the rule, and our dissent is based upon its application to the facts of the case. In the application of the rule, the directors are charged with knowledge when, by the exercise of ordinary care, they might have knowledge that the cashier was taking the money of the bank and using it in his own business ventures. They cannot escape liability on the ground that they were ignorant of the wrongdoing of the cashier, where their ignorance was the result of their failure to exercise reasonable or ordinary care in their supervision of the affairs of the bank. They cannot go to sleep and justify their action on the ground that the cashier had borne a good record previously for honesty and that he would continue to justify their good opinion. Bank directors must not merely be honest themselves, but they must exercise ordinary care and diligence to see that the cashier and his assistants are honest and continue to

be so. This is not a case where the shortage of the cashier resulted from single or disconnected acts of peculation on the part of the cashier and his assistant, but the shortage resulted from a continuous and connected course of fraudulent practices and dishonest acts on the part of the cashier and his assistant. The cashier and his assistant engaged in speculative ventures in real estate in Mississippi County, Arkansas, and in oil leases in the State of Louisiana, which required the use of hundreds of thousands of dollars. An account of these various enterprises was published in the local newspaper in the city where the bank was doing business. The directors knew that the cashier and his assistant did not have any money of their own, and they were charged with knowledge that they might be using the money of the bank. Their speculations extended over a period of three years without any effort on the part of the directors to find out if they were using the funds of the bank.

The record shows that there was a shortage of $607,526.55, which resulted from the act of Wilhite, the cashier, and Anthony, his assistant, in using the funds of the bank during the past three years. Of this amount, $117,019.51 represented overdrafts in the account of Wilhite and Anthony which had been running for three years. An additional $179,736.32 represented overdrafts in the account of James Reese, which had been running for three years. This account was a fictitious one and was not carried on the books of the bank. It represented money which had been taken by the cashier and used in his various speculations. It is insisted that these matters were covered up by spreading the various amounts of the overdrafts among the accounts of different customers. This was only done when it was expected that the bank examiner would come and examine the books of the bank, which only occurred once, or at most, twice a year. The bank examiner usually examined another bank in the city first, and Wilhite and Anthony had time to pad the accounts of the bank before the examiner came to exam-

ine their bank. The record shows that the directors met monthly and signed the statement prepared by the cashier without any effort to ascertain whether it was true or untrue.

Blaine seeks to escape liability on the ground that he was absent from two of these monthly meetings of the directors. This was no excuse. An examination or comparison of any monthly statement prepared by the cashier showing the reported cash on hand, cash items and daily balances, with the actual cash on hand and the overdrafts which were in the hands of the bank and carried as cash items, would have disclosed a shortage.

It is true that it might have been necessary to have a bookkeeper to examine the accounts of the bank to have disclosed the actual amount of the shortage and the nature of it, but no particular experience as a bookkeeper and no extended examination of the bank's books was necessary to show that an actual shortage existed. As we have already seen, the bank directors were put on notice that Wilhite and Anthony were using the funds of the bank by their actual knowledge that they were engaging in various enterprises requiring large sums of money and by their knowledge of the fact that they did not have any money of their own. A prudent man would have at least asked them where they got the money with which they were speculating, and would have counted the cash actually on hand when the monthly statements were made, and have compared the cash on hand with the daily balances showing a report of the cash on hand. This would have, of necessity, disclosed the existence of the overdrafts which were carried as cash items. An examination of the cash items would have led to the fact that Wilhite and Anthony had a large account in their own names with the bank, which showed that they were using the funds of the bank in their own speculations and were always overdrawn to a large amount. An examination of the cash items too would have led to a discovery of the account of James Reese and that this was a fic-

titious account resulting from large overdrafts, and that the money had been used by Wilhite and Anthony.

Then, too, the directors of the bank should have had their suspicions aroused during the month of August, when the cashier recommended that the bank should borrow over $300,000 with which to carry on its business. At this time the monthly statement showed a large cash balance and small overdrafts. Thus it will be seen that any sort of an examination or counting of the cash would have disclosed the shortage. If the bank had a large amount of cash on hand and a small amount of overdrafts, it would not be necessary to borrow a large amount of money with which to carry on the business of the bank. Hence no skill in bookkeeping nor any extended examination of the books of the bank was necessary to discover that a shortage existed.

Directors, by approving the monthly statements, gave assurance to the stockholders and depositors that the bank was being safely and honestly managed, without doing what prudent men of business would recognize in their own affairs as essential to make such an assurance of value. In this connection we call especial attention to the dissenting opinion of Mr. Justice Harlan in *Briggs* v. *Spaulding,* 141 U. S. 132, 11 S. Ct. 924, the trend of which has been substantially adopted and approved by this court in *Bank of Commerce* v. *Goolsby,* 129 Ark. 416, 196 S. W. 803.

Mr. Justice HUMPHREYS and Mr. Justice KIRBY concur in this dissent.