FIRST NATIONAL BANK OF MAGNOLIA v.
JOE F. RUSHTON

5-5587                                      472 S.W. 2d 945

Opinion delivered October 4, 1971
[Rehearing denied November 8, 1971]

*Wootton, Land & Matthews,* for appellant.

*Harry B. Colay, Chambers & Chambers* and *Warren & Bullion,* for appellee.

GEORGE ROSE SMITH, Justice. This suit was brought by the appellee, Dr. Joe F. Rushton, to impose liability upon the First National Bank of Magnolia for a number of obligations that Dr. Rushton had incurred in connection with Numark Manufacturing Company, a concern which was declared bankrupt in 1965. It was Dr. Rushton's theory that he had acted merely as trustee for the bank in incurring the obligations and that the bank was under a duty to reimburse him for the losses he sustained in the various transactions.

The bank pleaded several defenses, including estoppel, the clean hands doctrine, ultra vires, and the statute of frauds. At the first trial the chancellor sustained the bank's various defenses. On appeal, however, we reversed the decree and sent the case back for a complete new trial. *Rushton* v. *First Nat. Bank of Magnolia,* 244 Ark. 503, 426 S. W. 2d 378 (1968). Thereafter the Honorable James W. Chesnutt, Chancellor of the Third Chancery Circuit, was assigned to try the case anew.

The testimony at the second trial was not materially different from that at the first trial. We need not detail the complicated series of transactions involved in this litigation, because (*a*) the facts were narrated at length in our first opinion, (*b*) the bank concedes that the chancellor's findings of fact at the second trial were correct, and (*c*) the bank's appeal presents only one aspect of the case for review.

The issue now submitted by the bank concerns a promissory note for $97,787.77 which Dr. Rushton signed as trustee and which was eventually satisfied by the sale of securities belonging to Dr. Rushton. Dr. Rushton has contended all along that it was never intended that he be personally liable on the note, that he signed it as trustee for the bank, for the sole purpose

of assisting the bank in its effort to recoup losses it had sustained upon loans made to Numark's predecessor corporations, and that the bank, through its president, W. C. Blewster, had assured Dr. Rushton that he would be protected against any loss in the transaction.

In our opinion the preponderance of the evidence would support a finding that Dr. Rushton was in fact acting as trustee for the bank in signing the note. Numark was created at Blewster's direction, was dependent upon Blewster for its original financing, and was certainly not an independent entity dealing with the bank upon an equal plane when the $97,787.77 note was signed by Dr. Rushton as trustee. In this view the bank would be liable to Dr. Rushton.

The chancellor reached the same end result by a different line of reasoning. The chancellor concluded that Dr. Rushton was acting as trustee for Numark when he signed the note. The bank, however, knew that Dr. Rushton was acting merely as an agent for a disclosed principal. Consequently Dr. Rushton was not personally liable to the bank. *Ferguson* v. *Huddleston,* 208 Ark. 353, 186 S. W. 2d 152 (1945). The chancellor accordingly entered judgment in favor of Dr. Rushton for the face amount of the note, with interest and an attorney's fee.

In seeking a reversal the bank does not rely on any of the various defenses which it pleaded in the court below. Instead, the bank now asserts that Dr. Rushton was a director of the bank when the note in question was signed, that as a director Dr. Rushton owed a fiduciary duty to the bank, that the transaction with Numark resulted in the bank's having exceeded its loan limit of $100,000 to any one borrower, and that Dr. Rushton is therefore liable to the bank under the statutes governing national banks. 12 U. S. C. A. §§ 84 and 93.

Regardless of whether the bank's present theory was raised in the court below, which appears to be doubtful, counsel for the appellee have chosen to answer the argument solely on its merits. We adopt the same course.

The bank's loan limitation was $100,000. Under the federal statute a bank director is liable to the bank for a loss such as this one only if he "shall knowingly violate" the provisions of the statute. 12 U. S. C. A. § 93. The federal cases have consistently emphasized the requirement that the director's violation of the law must be *knowingly* committed. As the Supreme Court said in *Corsicana Nat. Bank* v. *Johnson*, 251 U. S. 68 (1919): "Under the rule settled by familiar decisions of this court, in order for the Bank to prevail in this action it must appear . . . that defendant, while a director, participated in or assented to the excessive loan or loans not through mere negligence but knowingly and in effect intentionally." There are many other decisions to the same effect.

Our inclination to think that the bank's present theory was not presented in the trial court stems in a large measure from the marked absence of convincing proof tending to show that Dr. Rushton knowingly and intentionally violated his fiduciary duty as a bank director. There is no proof whatever that Dr. Rushton was familiar with the bank's loan limit. He testified at great length, but he was never asked even a simple question about this point. In fact, in the bank's brief in this court counsel merely say that "it is inconceivable to believe that a man of Appellee's wide business experience and length of service as a bank director would not have known the Bank's loan limit was $100,000.00." We appreciate counsel's argument, but it falls far short of supplying the necessary proof that Dr. Rushton knowingly and intentionally violated the law.

Again, it is not shown that Dr. Rushton knew that the $97,787.77 transaction between the bank and Numark had the effect, in view of past transactions between the two companies, of exceeding the bank's $100,000 loan limit. Here again counsel merely say in the brief that it is "inconceivable" that Dr. Rushton would not have known about Numark's overdrafts at the bank. In fact, there is no proof that Dr. Rushton had any actual knowledge whatever about the overdraft situation.

With such glaring deficiencies in the proof we are unable to sustain the bank's argument for reversal.

It is not inappropriate to add that the equities in the case are with Dr. Rushton. He was a minority stockholder in Numark, with an investment of only $5,000. It is undisputed that when the business encountered financial difficulties he suggested that the stockholders abandon the enterprise and accept their losses. Instead, he was persuaded by the bank's president, Blewster, to guarantee the payment of various obligations involving huge sums. Blewster's purpose was unquestionably to rescue the bank from threatened financial losses attributable at least in part to Blewster's management of the bank, which was admittedly a "one-man" operation. As the chancellor observed, Dr. Rushton's fellow directors "were fearful that they might be held liable personally for dereliction of duty." Presumably the statute of limitations has now eliminated that threat. Dr. Rushton, however, lost more than a quarter of a million dollars as a result of his efforts to help Blewster and the bank. We do not feel that the chancellor's decision is contrary either to the law or to the equities in the case.

By cross appeal Dr. Rushton seeks to recover various other sums that he was compelled to pay out upon his various Numark commitments. The chancellor found the evidence insufficient to support Dr. Rushton's contentions in that respect. In this court counsel present no argument, either legal or factual, to indicate that the trial court was in error. Its decision must therefore be upheld.

Affirmed.

FOGLEMAN, J., dissents.

JOHN A. FOGLEMAN, Justice, dissenting. I concur in the court's action and the majority opinion on the cross-appeal. I do not agree with either the action or the opinion on appeal. A part of the disagreement at least arises from my disagreement with the premises upon which the majority based its action.

In the first place I do not agree that appellant's reliance is placed entirely upon the federal statute governing liability of a director of a national bank when the bank exceeds its statutory loan limitation. Appellant also argued that appellee violated his fiduciary duty to the bank when he permitted the bank's only security for the $97,787.77 note to be transferred to secure the indebtedness of Numark, in which he had a financial interest, on an obligation to the Texarkana National Bank, thus limiting the extent of his personal liability as endorser on the debt to the Texarkana bank and leaving appellant without any security on the $97,000 note. This argument is completely ignored by the majority, yet I feel that it has substance.

I do not, however, have any doubt that the defense based upon the federal statute was in issue in the trial court. It was alleged in appellant's amended answer that the acts involved were in violation of numerous laws governing the operation of bank institutions. While the specific act was not mentioned, appellee could easily have asked that the pleading be made more definite and certain, if there was really any doubt in his mind as to the laws invoked. This statute was made a basis of the bank's argument in support of the decree against Rushton on the prior appeal. Subsequent abandonment of this argument in the trial court would be indeed strange.

Neither do I agree with the majority that the preponderance of the evidence would support a finding that Dr. Rushton was in fact acting as trustee for the bank. Certainly, it cannot be said that the chancellor's finding that he was trustee for Numark is clearly against the preponderance of the evidence. Rushton was a stockholder and director of Odyssey Trailer Company, which became Numark Manufacturing Company by change of name. While he was elected president of Numark at a meeting from which he was absent, he was persuaded by Blewster, his associate in many business ventures other than the appellant bank, to accept the position. Having accepted, he could not totally ignore his responsibilities with impunity. He entered into an agree-

ment with the Texarkana National Bank guaranteeing the Numark obligation to that bank, as required by it. He personally endorsed Numark notes for additional loans by the Texarkana Bank and Republic National Bank of Dallas, Texas, on October 26, 1964, November 23, 1964, December 28, 1964, and January 24, 1965. Most, if not all, of these were signed by Rushton as president of Numark. Blewster's connection with the bank was terminated on November 19, 1964, so it is obvious that Rushton was not always motivated to assist in the financing of Numark solely for the benefit of the bank upon the persuasion of its president. The manager of Numark testified that after Blewster resigned from the bank Rushton continued to lend his personal credit for six or seven months by signing notes payable to the Stephens Security Bank and on government invoices on loans obtained from a bank in El Dorado.

A check payable to the bank to be applied on the $97,000 note was signed "Joe F. Rushton M. D. Trustee, Numark Properties." After the execution of that note, Rushton's personal financial statement filed with the bank on October 1, 1963, showed a liability to the bank of $97,500. Mr. Drew, manager of Numark, was familiar with the transactions and considered Numark obligated on the note.

Rushton testified that there was a written agreement covering the arrangement for his trusteeship for the bank. He said that the agreement was a four-or five-page document at the bank and that Blewster told him he could have it whenever he wanted it. When Blewster's discovery deposition was taken, he stated that he would have to look at the bank records to determine whether the bank agreed to hold Rushton harmless and to determine whether there were any records about the transaction. Blewster later testified that if Rushton said there was a trust agreement, there was one. Although Rushton could not recall having received a letter from Numark addressed to him and agreeing to hold him harmless from any liability he might incur by reason of having signed the $97,797 note, he admitted that he must have received it. It bore his signature. It seems as obvious

to me as it did to the chancellor that this is the trust agreement ot which Rushton referred.

At the time of the consolidation of Odyssey and Magnolia, Rushton was aware of an indebtedness of Odyssey to the bank in the amount of $35,000, because he was an endorser on the note. He also knew, by his own admission, that Blewster intended that the bank finance the operations of Numark after the merger of Odyssey and Magnolia if Rushton would serve as president "in name only." Blewster testified that the Odyssey indebtedness amounted to $85,633.99 when the Magnolia Woods Products property was deeded to Rushton as Trustee and the additional loan of $35,000 was made. There can be no doubt that this loan was for the benefit of Numark and made the total indebtedness to the bank amount to $218,421.76, far in excess of the bank's loan limit, which Blewster said was not more than $110,000. Even if the $62,000 due for Magnolia Woods property is eliminated under Rushton's theory that he was trustee for the bank, the Numark debt still exceeded the bank's loan limit. Later the overdrafts made the debt of Numark nearly triple the loan limit.

The overdrafts covered by the $225,000 note in which the Texarkana bank participated to the extent of $125,000 accumulated over a period of 12 to 16 months. Rushton testified that Numark obtained operating money by overdrafts at the bank. He stated that he realized this, but did not know the extent of the overdrafts until Blewster called his attention to the fact that they amounted to $225,000. He testified that the bank's loan limit was $100,000 and that it was necessary that the excess be carried by the Texarkana bank. Blewster testified that by the use of his and Rushton's credit Numark obtained operating capital during 1963 and 1964 based on overdrafts and borrowing from corresponding banks. Rushton could not have failed to know the approximate extent of the overdrafts if he had exercised any diligence in the performance of his duty as a director, because after regular audits made for the directors a list of the overdrafts was placed in a folder on the table each month for examination by the directors. Blewster said that at

least 45 people knew of the overdrafts. According to Blewster, he realized his own liability for permitting these overdrafts and advised Rushton that if these continued he (Blewster) would lose his job. He said that Rushton then agreed to secure the Texarkana bank for its participation in the loan to clear the overdrafts and put up his Berry stock to help him out of a jam. Blewster added that Rushton kept the First National Bank from losing "all that money." It must also be remembered that through this transaction the $97,000 note to appellant made by Rushton as Trustee was denuded of security.

I readily agree with the chancellor that liability of Rushton cannot be asserted upon the basis of the note alone. It seems very clear that the bank was on notice that Rushton was acting for a disclosed principal, Numark. This does not reach Rushton's liability as a director of the bank, either under the federal statute or at common law.

As to the statutory liability, I cannot agree with the majority's reading of *Corsicana National Bank* v. *Johnson,* 251 U. S. 68, 40 S. Ct. 82, 64 L. Ed. 141 (1919). The language quoted in the majority opinion is immediately followed by the words "with this qualification: that if he deliberately refrained from investigating that which it was his duty to investigate, any resulting violation of the statute must be regarded as 'in effect intentional' (*Thomas* v. *Taylor,* 224 U. S. 73, 82, 56 L. ed. 673, 678, 32 Sup. Ct. Rep. 403; *Jones Nat. Bank* v. *Yates,* 240 U. S. 541, 555, 60 L. ed. 788, 799, 36 Sup. Ct. Rep. 429)." In that case, the court also made these pertinent remarks relating to the application of the statute in a suit by a bank against an officer and director:

> Nor would the absence of any improper motive or a desire for personal profit on defendant's part be a defense; nor the fact that in spite of a loss upon this transaction the Bank remained solvent or even prosperous. Neither is the question of defendant's liability, or the extent of it, to be affected by the fact, if it be a fact, that other officers or directors of the Bank were in part responsible, yet defendant alone was sued; nor that the Bank refrained from

suing him until after a change in the stockholding interest or control.

\* \* \*

In the present action the Bank represents the interest of its shareholders, as well as of its creditors; and if there was a violation of the act by defendant, with resulting diminution of its assets, the Bank is entitled to recover the damages thus sustained, notwithstanding it remained solvent, and irrespective of any changes in its stockholding interest or control occurring between the time the cause of action arose and the time of the commencement of the suit or of the trial. Even if it appeared that new stockholders acquired their interests with knowledge of the fact that such a loss had been sustained and that defendant was responsible for it, neither they nor the Bank would be thereby estopped from having full recovery from defendant.

In *Corsicana,* it was held that there was a jury question whether the defendant officer and director was liable to the bank under the statute. This conclusion was based in part upon an inference that the defendant either knew of a letter from the Comptroller of the Currency requiring reduction of certain loans "or, in the proper performance of his duties, would have known of it."

The key words in the *Corsicana* bank case which foreclose the application made of it by the majority are "in effect intentionally" as explained by the qualification. The language of *Corsicana,* in my opinion, would bar, rather than permit, Rushton's recovery.

Other courts have held the act applicable to factual situations not unlike the one before us. See Annot. 64 L. Ed. 141, et seq. See also, Annot., 25 A. L. R. 3d 932, et seq. In a case strikingly similar in many respects to the one before us, the Arizona Supreme Court rejected a director's claim against a bank based upon just such arguments as are advanced by Rushton: *i. e.,* that as a director, he knew nothing about the bank, had nothing to do with making loans, and merely signed when they

told him to sign. *McQueen* v. *First National Bank,* 36 Ariz. 74, 283 P. 273 (1929). After emphasizing that a director was liable under the *Corsicana* case only if he assented knowingly or intentionally or had deliberately refrained from investigating that which it was his duty to investigate, the court then elaborated upon the duty of a bank director to the bank, its stockholders and customers, which extends much further than the selection of officers and delegation of management to them. That court pointed out that a director's duty included supervision of the affairs of the bank, acquisition of a general knowledge of the manner in which its business is conducted and keeping such a degree of intimacy with its affairs to know to whom, and upon what security, its large lines of credit are given. That court aptly quoted from *Gibbons* v. *Anderson,* 80 F. 345 (C. C., Mich. 1897) as follows:

> The stockholders might elect a cashier, and a president as well. The banks themselves are prone to state, and hold out to the public, who compose their boards of directors. The idea is not to be tolerated that they serve as merely gilded ornaments of the institution, to enhance its attractiveness, or that their reputations should be used as a lure to customers. What the public suppose, and have the right to suppose, is that those men have been selected by reason of their high character for integrity, their sound judgment, and their capacity for conducting the affairs of the bank safely and securely. The public act on this presumption, and trust their property with the bank in the confidence that the directors will discharge a substantial duty. How long would any national bank have the confidence of depositors or other creditors if it were given out that these directors whose names so often stand at the head of its business cards and advertisements, and who are always used as makeweights in its solicitations for business, would only select a cashier, and surrender the management to him? It is safe to say such an institution would be shunned and could not endure. It is inconsistent with the purpose and policy of the banking act that its vital interests

should be committed to one man, without oversight and control.

The statute was also applied and interpreted in *Grandprey* v. *Bennett,* 41 S. D. 619, 172 N. W. 514 (1919) in a suit by depositors against a bank's directors after insolvency of the institution. The plaintiffs alleged that the directors made false reports to the Comptroller and did not diligently and honestly manage the bank's affairs. The court held that these allegations were sufficient to constitute a cause of action under the federal statute, relying upon various decisions of the United States Supreme Court that there is, in effect, an intentional violation of the statute whenever a bank director deliberately refuses to examine that which it is his duty to examine, or deliberately refuses to do any act required by the statute. The South Dakota Court held that allegations charging the directors with lack of diligence and negligence in failing to discover true facts which could have been ascertained by reasonable attention to the performance of the director's duties were proper statements of a cause of action under the statute.

It is also clear that a national bank director's liability is not circumscribed by the federal statute, and that factual allegations such as are made in this case are sufficient to charge not only a violation of the National Bank Act, but a violation of common law obligations, so that, if the evidence fails to establish a statutory liability, a decree may be entered by application of the common law rule for measuring common law liability. *Bowerman* v. *Hamner,* 250 U. S. 504, 39 S. Ct. 549, 63 L. Ed. 1113 (1919); *Michelsen* v. *Penney,* 135 F. 2d 409 (2nd Cir. 1943); *Grandprey* v. *Bennett,* supra.

The whole subject is given excellent coverage in 3 Fletcher, Cyclopedia Corporations 660, et seq., § 1063 wherein it is said:

The National Bank Act imposes upon directors duties which do not rest upon them at common law, among which is the furnishing to the Comptroller of the Currency reports concerning the condition of the bank and the publication thereof. The

Supreme Court of the United States held that the former section "affords the exclusive rule by which to measure the right to recover damages from directors, based upon a loss alleged to have resulted solely from the violation by such directors of a duty expressly imposed upon them by a provision of the act," and that "liability cannot be entailed upon them by exacting a different and higher standard of conduct as regards such commands than that established by the statute without depriving directors of an immunity conferred upon them." In a later case, the Supreme Court of the United States held that there was liability in case of an intentional violation of a statute by deliberately refusing to examine that which it was the duty of the directors to examine; and that where the Comptroller of the Currency gave notice to directors to charge off certain assets, the disregarding of such notice and representing such assets in a statement to be good was a violation of the statute so as to make the directors liable to one injured thereby. This qualification has since been repeated as a part of the rule. More recently the court has limited earlier decisions to hold that a defense of estoppel which a director might have against the bank as to a violation of the Act will not be good as against the receiver, saying that "it is the evil tendency of the prohibited acts at which the statute is aimed, and its aid, in condemnation of them, and in preventing the consequences which the Act was designed to prevent, may be invoked by the receiver representing the creditors for whose benefit the statute was enacted."

In light of the modern trend toward increasing the responsibility of bank fiduciaries, the courts would not be justified in holding that the statutory liability of directors extends the area of protection accorded a director. It is true, as it is appropriate, that a director conscientiously carrying out the duties of his office cannot be held for statutory violations of which he neither has nor should have knowledge. There the statute is the only measure of responsibility. But where he has substantially abdicated the

responsibilities of his office, then the common-law principle which is in addition to the statutory rules operates to make him liable for losses improperly incurred by his co-officers to whom he has abandoned the operation of the bank. Thus, the true rule is that the statutory liability of directors of a national bank is the measure of the right of recovery against them for loss resulting solely from their violation of the express provisions of the statute, but that does not exclude their common-law liability for negligence in the management of business of the bank in violation of their oath of office which results in loss to its creditors and stockholders. Where the gist of the action is a violation of the duty imposed by the National Bank Act to justify a recovery, it must in effect be shown that there has been an intentional violation of the provisions of the act. Beyond this, however, the director is still under the common-law obligation to be honest and diligent in administering the affairs of the bank, and this his oath of office specifically requires.

These principles stated by the above authorities are not new to this court or to Arkansas law. Under Kirby's Digest 863, a corporate director was made liable for "intentional neglect" to comply with the statutory provisions governing corporations. In *Fletcher* v. *Eagle,* 74 Ark. 585, 86 S. W. 810, it was held that directors of a bank were liable to its creditors for misappropriation, mismanagement or unwise investment by the president by reason of having entrusted the management to one whom they believed to be competent, honest and faithful in the discharge of his duties, unless they could not have prevented dissipation of the bank's assets by attention to the duties required of them by statute, common usage, and the by-laws of the bank. In *Bailey* v. *O'Neal,* 92 Ark. 327, 122 S. W. 503, a jury verdict was directed against bank directors in suits by depositors. The clear import of this case is that directors are "intentionally negligent" whenever a series of connected acts of negligence continued for such a length of time that it must be inferred that their acts of negligence were intentional. There, the evidence showed that the

directors knew the ability of a principal borrower of extensive amounts which were inadequately secured to repay its indebtedness depended upon profits to be made by it and that the indebtedness had rapidly increased. We pointed out that the directors cannot be mere figureheads and cannot escape liability by delegating the exclusive management to one officer, but must manage, control and generously supervise the affairs of their bank.

In *Magale* v. *Fomby*, 132 Ark. 289, 201 S. W. 278, the bank directors were held not liable to shareholders because of the statute of limitations. The court held, however, that bank directors would be liable for losses resulting from inadequately secured loans of $30,000 to a canning company capitalized at $10,000 in which they had stock, and which continually operated at a loss, though they believed it would ultimately pay a profit. It was said that the directors *must* have known these facts and that they were guilty of such reckless conduct as to constitute actionable negligence. This part of the decision was rested upon *Bank of Commerce* v. *Goolsby*, 129 Ark. 416, 196 S. W. 803. In that case, it was said that our statutes create a relationship between directors and stockholders and confer a power of management upon directors which necessarily carry corresponding duties and liabilities, independent of statute, which must be ascertained and controlled by common-law rules applicable generally to such relations and powers. The court declared the relationship as one of such a high degree of trust and confidence as to be more nearly comparable to trustee and cestui que trust than to agent and principal. We adopted the doctrine that it is the duty of bank directors to use ordinary diligence in ascertaining the condition of the bank's business and that they may be presumed to have known that which by proper diligence they ought to have known, and that a rule no less stringent should apply between the bank and its directors. See also, *Muller* v. *Planters Bank and Trust Company*, 169 Ark. 480, 275 S. W. 750, where the doctrine is reaffirmed.

Knowledge of all of the affairs of a bank cannot be imputed to a director for the purpose of charging him

with liability, unless there is something about the conduct of an officer or the affairs of the bank that would arouse the suspicion of a man of ordinary prudence. *Sternberg* v. *Blaine,* 179 Ark. 448, 17 S. W. 2d 286. Assuming, but not conceding, that Dr. Rushton was not possessed of actual knowledge sufficient to render him liable to the bank, it cannot be said that he was not put upon inquiry when his friend Blewster confessed the extent of the overdraft, his fear of an *impending* examination and the danger of the loss of his job. I do not see how it is possible to justify the subsequent action effectively stripping the bank (and ultimately its stockholders) of any security whatever for a $97,000 debt.

It is indeed regrettable that one such as appellee should suffer such great losses by reason of his implicit confidence in the integrity, judgment and competence of a friend. Yet, as between a bank director and its stockholders, the loss should fall upon the one who misplaced the confidence whenever he was possessed of knowledge of such facts as would have provoked further inquiry by an ordinarily prudent bank director. I submit that such facts existed and that Rushton, unfortunately, had both a statutory and common law liability.

Supplemental opinion on rehearing delivered
November 8, 1971

BANKS & BANKING—DIRECTOR'S DUTY AS FIDUCIARY, VIOLATION OF—SUFFICIENCY OF EVIDENCE.—Rehearing denied where the proof failed to show bank director was aware of the bank's loan limit at the time the events were taking place, and the proof failed to establish a violation of director's common law or statutory duty as a fiduciary.

GEORGE ROSE SMITH, Justice, on rehearing. The appellant now calls attention to a sentence in Dr. Rushton's testimony, in which he stated that the bank's loan limit was $100,000.00. Of course Dr. Rushton learned that fact during the first trial of this case, but there is no direct proof that he was aware of it when the events were taking place. As we indicated in our opinion, that question was not developed at the trial.

It is also argued on rehearing that we overlooked the appellant's contention that Dr. Rushton violated his common law duty as a fiduciary, as well as his statutory duty. The point was not overlooked. It was and is our view that the proof did not establish a violation of either duty; so there was no reason for us to make any distinction between the two.

Rehearing denied.

FOGLEMAN, J., would grant the rehearing.