MULLER v. PLANTERS' BANK & TRUST COMPANY.

Opinion delivered October 12, 1925.

BANKS AND BANKING—LIABILITY OF DIRECTORS.—While bank directors are liable, to stockholders as well as creditors, for failure to exercise diligence and good faith in managing the affairs of the bank, the mere exercise of poor judgment is not sufficient to form a basis of liability.

Appeal from St. Francis Chancery Court; A. L. Hutchins, Chancellor; affirmed.

F. F. Harrelson, S. S. Hargraves and J. M. Prewett, for appellant.

R. J. Williams, C. W. Norton and Mann & Mann, for appellee.

McCULLOCH, C. J.   This is an action instituted in the chancery court of St. Francis County by appellants, who were stockholders of the Planters' Bank, a defunct corporation, organized and doing business at Forrest City, against the directors of the bank to recover on account

of alleged negligence in the operation of the affairs of the bank.

The Planters' Bank & Trust Company, a banking corporation at Forrest City, which took over the assets of the Planters' Bank and assumed its liabilities to depositors, was joined as defendant, and recovery against that institution was sought by appellants on the ground alleged in the complaint that the consent of the stockholders to the transfer of the assets of the Planters' Bank was induced by false and fraudulent representations of the directors of the old bank, who also became directors of the new bank, concerning the value of those assets and the financial condition of the old bank. There are certain other allegations of fraud and misconduct, but in the presentation of the case here the only relief sought is against the directors of the Planters' Bank for alleged negligence in managing the affairs of the bank.

The Planters' Bank was organized in the year 1910 with Henry P. Gorman, an experienced banker, as cashier. He died in the year 1918, and was succeeded by a young man who had been his assistant for five or six years prior to that time. The affairs of the bank were in a prosperous condition until the summer of 1920, when it was discovered that the affairs were in a doubtful condition on account of insufficient securities from borrowers. The bank experienced difficulty in keeping up its cash reserve, and from time to time some of the directors borrowed money on their own private securities and placed it in the bank in order to restore the cash reserve.

On May 2, 1921, a meeting of the stockholders was held, at which a resolution was adopted with substantial unanimity by which the directors of the bank were authorized to liquidate the affairs of the bank by transferring all of its assets to a new banking institution then organized under the name of the Planters' Bank & Trust Company, that institution assuming all of the liabilities to the depositors of the old bank. The resolution adopted specified in detail the terms of the deal to be consummated with the Planters' Bank & Trust Company, and that

arrangement was carried out by the directors in accordance with the resolution.

The Planters' Bank & Trust Company assumed the liabilities to the depositors of the old bank, and the directors of the old bank conveyed to it the banking house and fixtures and the bulk of the bills receivable and securities of the face value of $219,468.39. These assets were taken by the new bank at face value, but the sum of such value being about $14,000 less than the assumed liabilities, the Planters' Bank & Trust Company agreed to, and did, advance that sum upon the transfer to it as collateral security of the remainder of the bills receivable and securities of the old bank of the face value of $76,447.36. A note was executed to the Planters' Bank & Trust Company for said sum of $14,000, and the last mentioned batch of doubtful securities were transferred to a trustee as collateral security for the note. Prior to that time two of the directors of the old bank had, in order to keep up the cash reserve, borrowed the sum of $40,000 and deposited it in the bank, not to be checked out, and the old bank was thereby indebted to those directors in that sum at the time of the liquidation. That debt, however, was not assumed by the new bank, but a note was executed to those two directors for the amount and the securities of the face value of $76,447.36 were held by the trustee as collateral security for said note, subject to the prior lien of the Planters' Bank & Trust Company for the $14,000 note. The Planters' Bank ceased to do business, and was succeeded by the new institution, the Planters' Bank & Trust Company, the latter institution being made up principally of stockholders of the old bank. All of the stockholders of the old bank were offered stock in the new; many of them, however, including appellants, did not take advantage of the offer.

It is alleged that the directors of the bank negligently permitted Gilliam, the cashier, to conduct the affairs of the bank recklessly and without good judgment, which caused losses to the extent that it became insol-

vent. It is also alleged that Gilliam used funds of the bank for his own private purposes and was short in his accounts, and that this occurred by reason of the negligence of the directors, who, it is alleged, allowed him to continue to handle the affairs of the bank after his shortage occurred, and after it was known that he had made bad loans.

The record in the case is very large, and the testimony on the only issue left in the case for our determination is voluminous. The testimony is undisputed as to the condition of the bank at the time of the liquidation of its affairs, but there is a conflict in the testimony as to the cause of the losses—whether by negligence of the cashier and the directors, or whether they occurred from depreciation in value of the securities, which occurred in the year 1920. It is undisputed that the bank had liquid assets in the form of secured loans of the value of $219,468.39, which were turned over to the new institution at their face value, and that the doubtful securities were of the face value of $76,447.36. It is conceded that the last mentioned lot of securities were of very doubtful value, and that there will be heavy losses on the same, but there is some conflict as to the extent of the loss. The testimony adduced by appellants singles out many items of the securities which the testimony tended to show were bad loans—loans that were ill advised and insufficiently secured at the time they were made. On the contrary, the testimony adduced by appellees tended to show that, while most of these securities were of little value at the time of the liquidation, they were good at the time the loans were made, and that the losses occurred by reason of general depreciation in property values. There is a conflict in the testimony also as to the extent of the personal attention given to the affairs of the bank by the directors. Appellants undertook to show that the directors gave very little attention to the affairs of the bank, and left everything in the hands of Gilliam, the cashier. They support this by introducing the minute book to show that the meetings of the board of

directors were not regularly held, but that long intervals occurred between these meetings. On the other hand, the directors and other witnesses introduced testified that the directors gave personal attention to the affairs of the bank, and supervised the transactions conducted by the cashier, and that the directors were not derelict in their duty. The minutes of the directors' meetings were not conclusive as to the extent of the attention given by the directors to the business of the institution. It would serve no useful purpose to detail the various loans around which the controversy turns as to the conduct of the directors and the cause of the losses. Suffice it to say that the finding of the chancellor that the directors gave a reasonable amount of attention to the management of the affairs of the bank and were not negligent in that respect is not against the preponderance of the evidence.

There is a conflict in the testimony as to when the directors ascertained that the cashier was short in his accounts. According to the preponderance of the evidence, this discovery was not made until some time in January, 1921, and as soon as it was made the directors placed restrictions upon the cashier which prevented him from making away with any more assets of the bank. It also shows that they were not negligent in failing to make earlier discovery of the cashier's shortage. There is no proof to show that there were any losses, either in making loans or by speculations of the cashier, after it was ascertained that the affairs of the bank were not in a satisfactory condition. All the testimony tends to show is that the depreciation in values began in the mid-summer of the year 1920 and progressed so rapidly that by the autumn of that year there was a slump in values that caused heavy losses to all business enterprises, especially to banking institutions which held collateral from farmers and merchants.

There is nothing in the record to warrant an inference of unfairness or wilful misconduct on the part of any of the directors of the bank. The most that is war-

ranted, we think, is that in some instances there was poor judgment exercised in making loans. The aggregate amount of the loans made in these instances where poor judgment is fairly inferable is not sufficient to have caused the bank's failure, for a greater part of the losses were shown to have occurred by depreciation in values, for which no one connected with the institution was responsible.

It is earnestly urged that the directors were at least negligent in failing to collect the shortage from the defaulting cashier. The amount of the shortage is not precisely given in the record, so far as we observe, but it appears to be somewhere in the neighborhood of seven or eight thousand dollars. The cashier had given a bond with a surety company as security, and immediately upon discovery of the defalcation the company was notified. Later, however, a settlement was arranged whereby the cashier gave notes for the amount, signed by his relatives, and those notes appeared to be good security for the amount of the shortage. The notes, however, were not paid, and there is a conflict in the testimony as to whether the amounts will ever be paid. The amount of the loss on this account was small in comparison with the other losses, and it had no substantial effect upon the status of the bank. If the loss in that way were restored, it would be absorbed by the liabilities of the bank which were assumed by the directors and the additional amount still owing to the two directors who supplied the funds to keep up the cash reserve.

The law applicable to the case is well settled by decisions of this court. We have decisions declaring the statutory liability of directors of a corporation to the creditors thereof. *Fletcher* v. *Eagle,* 74 Ark. 585: *O'Neil* v. *Eagle Generator Co..* 92 Ark. 416; *Bailey* v. *O'Neal,* 92 Ark. 327; *Wait* v. *McKee,* 95 Ark. 124. There are also decisions defining the duty and liability of directors to stockholders. *Bank of Des Arc* v. *Moody,* 110 Ark. 39; *Bank of Commerce* v. *Goolsby,* 129 Ark. 416. In *Bank of Commerce* v. *Goolsby, supra.* it was said with respect

to the duty of directors to stockholders as follows: "We have no statute expressly defining such duties and prescribing liability for failure to discharge such duties, as in case of creditors. The statute, however, in broad terms, as we have seen, places the 'stock, property, affairs and business of such corporations' under the care of their board of directors, to be managed by them. The statute creates a relation and confers a power which necessarily carry with them corresponding duties and liabilities, independent of any statute specifically defining or limiting those duties and liabilities; and, in the absence of any statute, they must be ascertained and controlled by common law rules applicable generally to such relations and powers." The court then adopted the rule announced by Mr. Justice Harlan in the case of *Briggs* v. *Spaulding*, 141 U. S. 132, as follows: "Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision over its officers. They have something more to do than, from time to time, to elect officers of the bank, and to make declarations of dividends. That which they ought, by proper diligence, to have known as to the general course of business in the bank, they may be presumed to have known, in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business. * * * A rule no less stringent should be applied as between a banking association and directors representing the interests of stockholders and depositors." The substance, therefore, of the test laid down in that case of the responsibility of directors to stockholders as well as to creditors is good faith and diligence. The mere exercise of poor judgment is not sufficient to form a basis of liability, for when directors are selected by the stockholders the latter assume the risk of losses occurring on account of mere defects in judgment, and in acceptance of the

office by the director he merely assumes the obligation to manage the affairs of the institution with diligence and good faith. Applying this test to the case in hand, we are of the opinion that the evidence is not sufficient to make out liability on the part of the directors. There is no bad faith shown, nor is there a preponderance of the evidence showing a failure to exercise ordinary care, such as business men of reasonable prudence would have exercised under the same circumstances.

Finding no error in the decree, the same is affirmed.