MILBURN v. MARTIN.

4-3610

Opinion delivered December 10, 1934.

*V. D. Willis* and *Shinn & Henley,* for appellant.

SMITH, J. Appellee, L. M. Martin, alleged, and the undisputed testimony shows, that he had on deposit in

the Citizens' Bank & Trust Company, of Harrison, here-inafter referred to as the Harrison bank, something over two thousand dollars when that institution failed and closed its doors on September 1, 1931, and he brought this suit to recover the amount of the deposit, less a dividend of 13½ per cent. which had been paid him. The suit was brought against appellant, T. E. Milburn, who was a director and president of the bank when it failed, and for cause of action it was alleged that appellant, as a director and as president of the bank, caused to be published in a local newspaper a statement showing that the bank was in a sound condition, which statement was misleading and false and made with knowledge of its falsity; that the appellant and his associates in the bank set up false and erroneous assets on the books of the bank, and made false reports to the State Banking Department for the fraudulent purpose of deceiving plaintiff and others and inducing them to make deposits of money in the bank, all of which were calculated to induce, and did induce, plaintiff to make the deposit which he sued to recover. It was also alleged that appellant and his associates in the bank from time to time diverted the assets of the bank, and exchanged its cash and valuable paper for worthless paper in order to carry on the financial affairs and to prevent the failure of other banks in which appellant and other officials of the Harrison bank were interested. It was also alleged that appellant, as a director and as president of the bank, had failed to perform the duties imposed upon him by law in the matter of supervision, inspection and direction of the affairs of the bank. The answer contained a specific denial of all these allegations. There was a verdict and judgment in favor of the plaintiff, from which is this appeal.

Much testimony was offered in relation to a statement of the bank's condition which was alleged to have been published in the *Harrison Times,* a local newspaper, reading as follows:

"RESOURCES

"Loans and discounts ................................................$1,059,136.08
"Bonds and other securities.................................... 63,615.92

"Furniture and fixtures ................................................. 9,804.80
"Banking house ........................................................... 20,980.00
"Other resources ........................................................ 133,641.04

$1,291,403.58

## "LIABILITIES

"Capital ...............................................................$ 100,000.00
"Surplus and profits ................................................. 30,359.20
"Bonds sold with purchase agreement.............. 18,000.00
"Bills payable ........................................................... 163,244.89
"Deposits ................................................................... 979,799.49

$1,291,403.58

"Signed by D. N. Holmes,
"Cashier."

It is very earnestly insisted that no competent testimony was offered that such a statement was published, but we pretermit a discussion and decision of that question, as its publication, if published, would not alter the conclusion we have reached.

There were objections and exceptions to the competency of evidence tending to show that the State Banking Department had been requested to bring this suit for the benefit of plaintiff and all other depositors, but had declined and failed to do so, which we also find it unnecessary to pass upon. But, in passing, it may be said that the bank's statement, above copied, would not indicate, even upon casual reading, a very sound condition. It shows liabilities of nearly a million three hundred thousand dollars, without any showing as to cash on hand or on deposit with other banks. One item which could have covered cash was that of "Other resources," amounting to $133,641.04, but what these "Other resources" were or how much thereof was cash was not disclosed in the statement.

It was shown also that, when the bank closed its doors, it had on hand a large amount of paper, much of which proved to be entirely worthless, and some of which had but recently come into the possession of the bank and was not shown to be the property of the bank by the records of the bank. This testimony was offered to sup-

port the allegation that just before closing its doors there had been a substitution of doubtful paper for more valuable paper. When the liquidating agent had made all the collections and compromises and settlements which he was able to make there remained in his hands $112,000 worth of paper which he sold for $500.

There are, however, certain undisputed facts in the record before us which explain these transactions, and which must and do control the conclusion we have reached.

The appellant was president, not only of the bank, but one of the large business concerns in the city of Harrison, and there is no testimony as to any dishonest or disloyal act on his part; nor is there any testimony that he failed to perform the duties imposed upon him by law nor failed in his attention to and supervision of the affairs of the bank. He owes the bank nothing, and on the day before it closed he deposited $156 to his personal account, and $700 to the account of the business of which he was also president. He was not connected with any other bank, and there was no sensible reason why he should consent to wreck his own institution in the futile attempt to save other banks in which he had no interest.

The undisputed evidence shows that the bank first closed its doors on December 18, 1930, at which time appellant was both a director and president. All persons interested desired that the bank be reopened if possible, and various meetings were held, some of them open to the public, in which plans for that purpose were discussed. W. P. Watkins, a deputy Bank Commissioner acting as liquidating agent, participated in these negotiations, and a plan was finally evolved whereby the bank might reopen, which was duly approved. This plan fixed the time within which a designated per cent. of deposits might be withdrawn.

There was much testimony to the effect that, after the bank had been permitted to reopen, it was in a fair way to have been completely rehabilitated, and would have been but for the total collapse of all values, which was not peculiar to that locality. According to the testi-

mony of appellant and other officers of the bank, the greatest diligence was used in the management of its affairs after it reopened. The board of directors met regularly, not less than once each month, and frequently oftener, at which time a typewritten copy of a statement was given to each director showing all transactions since the last meeting, including the paper still on hand and also that acquired since the last previous meeting. The board had an auditing committee which functioned regularly. The managing officers were shown to have acted pursuant to and in accordance with resolutions duly passed by the board of directors, and no loan was made until it had been duly examined and approved by the officers having that authority. This testimony may not, however, be treated as undisputed, although much corroboration is afforded it by the records of the bank, for the reason that the testimony comes from interested parties. *Skillern* v. *Baker,* 82 Ark. 86, 100 S. W. 764; *Missouri Pacific Rd. Co.* v. *Trotter,* 184 Ark. 790, 43 S. W. (2d) 762; *Missouri Pacific Rd. Co.* v. *McDade,* 186 Ark. 317, 53 S. W. (2d) 595. However, there is some undisputed testimony which it would be arbitrary to disregard. This was given by H. A. Daugherty, one of the State bank examiners, who had made frequent examinations of the bank, and the last examination which was made before it closed and who was thoroughly familiar with its management and its affairs. He testified that he assisted in making an appraisal of the bank's assets when it first closed to ascertain whether it might be permitted to reopen, and, if so, upon what conditions. He said paper was found then in the possession of the bank having but little or no value amounting to $42,000. It was required that this paper be charged off and that the capital stock of the bank be reduced from $100,000 to $75,000, and a reduction was ordered in the surplus and undivided profits, which made a sum equal to the amount of notes which had been charged off. It was his recollection that the bank was permitted to reopen in February, 1931, and some time would be and was required to actually reduce the capital stock, and if the statement, set out above, was published on March 31, 1931, as appellee contends, showing that

the capital stock was $100,000, that was, of course, $25,-000 in excess of what it would have been when the reduction was subsequently made, as was later done. But, as has been said, liabilities were correspondingly reduced when it was done. He also testified that he observed the experience, diligence and good faith of appellant, who co-operated at all times and in every respect with all the orders and requirements of the State Banking Department, and that he recalled no instance when there had been a refusal to do so. He also testified that he found no instance in which the bank was carrying the notes of any director upon which there was a liability, either as maker or indorser, which was not shown in the reports required from the bank by the State Banking Department.

There was testimony that when the bank closed the second and last time notes were found in the note file which had been made or indorsed by certain directors which were not shown in any of the reports to the State Banking Department. But Daugherty testified that these notes were not among the bank's assets at the time of any examination, and were found in the possession of the bank only after the second closing.

Much testimony was offered in regard to these and a number of other notes, and this opinion would be almost interminable if all were discussed. It is claimed that the possession of these notes shows there was a juggling of the bank's assets, which resulted in loading the bank with a lot of worthless paper, which would not have occurred under an efficient and honest administration of the bank's affairs. But the undisputed facts appear to be as follows: The First State Bank of Marshall used the Harrison bank as its principal correspondent. A. T. Hudspeth owned the Marshall bank, and was a large stockholder in the Harrison bank. Appellant had no connection with the Marshall bank. It was the practice of the Marshall bank to rediscount certain of its paper with the Harrison bank under a guaranty as to its value, which guaranty was generally secured by a deposit practically equal to the amount of the discounts, so that, if any paper was not paid at maturity, it could be charged

against the deposit and returned to the Marshall bank. Hudspeth owned and operated a chain of banks, of which the Marshall bank was one, and through these banks he had extensive dealings with the Grand National Bank of St. Louis, which was a correspondent of Hudspeth's entire chain of banks.

The troubles of the Harrison bank were encompassed, or at least precipitated, by the failure of the American Exchange Trust Company of Little Rock, an institution with which Hudspeth was known to have had extensive connections. Hudspeth absconded on Friday, and the Harrison bank closed on the following Tuesday, as it was unable to meet the run upon it. Daugherty testified that the Harrison bank was believed to be sound, and that the State Banking Department did not order it closed; that circumstances closed it. Among others this one. The Harrison bank had a line of credit with the Grand National Bank of St. Louis, and carried a large deposit there. It also had a line of credit and carried a substantial deposit with the American Exchange Trust Company of Little Rock, and the closing of that bank rendered both the line of credit and the deposit unavailable. About this time the bank at St. Louis began to feel the pressure of the withdrawal of deposits by its own depositors, and that bank withdrew its line of credit to the Harrison bank and charged against its deposits a large number of notes, some of which, as we understand the record, had been acquired by the St. Louis bank, not through the Harrison bank, but through Hudspeth and the Marshall bank, which Hudspeth owned and controlled. Litigation arose between the Harrison bank and the St. Louis bank out of this alleged wrongful action, which, so far as the record before us discloses, has not yet been determined.

There appears to be no testimony that appellant was guilty of any act of omission or commission which resulted in the substitution of worthless for valuable paper; nor does it appear that any report was made to the State Banking Department which was false when made. The testimony of the bank examiner who had the most intimate knowledge of all the bank's affairs makes very

clear the fact that no deception was practiced upon him, and also the fact that he accuses the bank officials of no wrongdoing. Another circumstance responsible for the insolvency of the Harrison bank is the fact, testified to by Daugherty, that it was the experience of the State Banking Department that the closing of a bank results in the immediate depreciation in the value of its loans of from 25 to 50 per cent.

A witness named Green, who was a depositor, testified that, on the day the Harrison bank closed, appellant left the impression on him "that there was no danger in the bank." Appellant denied that he said anything to Green calculated to leave that impression; but, even so, the statement was not communicated to appellee, and no action that appellee might or could have taken was influenced thereby, although appellee admitted at the trial before the jury that he did think the Harrison bank would have weathered the storm but for the wrongful action of the St. Louis bank in charging back the notes above referred to.

The duty of bank directors and that of the presidents of banks has been frequently defined, two of the late cases on the subject being those of *Ford* v. *Taylor*, 176 Ark. 843, 4 S. W. (2d) 938, and *Sternberg* v. *Blaine*, 179 Ark. 448, 17 S. W. (2d) 286. These and the cases there cited are to the effect that, while bank directors are liable to stockholders as well as creditors for failure to exercise diligence and good faith in managing the affairs of the bank, the mere exercise of poor judgment is not sufficient to form the basis for liability. The duty of the president and his liability for losses are measured by the same standard, account being taken of his added responsibility and authority.

It is said, in § 143, volume 1 of Morse on Banks and Banking (6th ed.), page 373, that "the president is usually expected to exercise a more constant, immediate, and personal supervision over the daily affairs of the bank than is required from any other director." See also § 36, volume 1, Michie on Banks and Banking, page 137.

But in determining whether a president of a bank has discharged, or has failed to discharge, his duties, the

same rule as to diligence, fidelity, and care, and responsibility for the lack thereof, is imposed as in the case of directors, account being taken of the difference in their duties.

Under this test, as explained in the cases above cited, there were no acts of commission or of omission making appellant liable to appellee for his losses as a depositor. The case is not unlike many others resulting from the loss of market value or other value of property generally.

It is our opinion therefore that a verdict should have been directed in appellant's favor, and for this reason the judgment will be reversed, and the cause will be dismissed.