**HI-PRO FISH PRODUCTS, INC., et al.,**
**Plaintiffs,**

v.

**Robert Y. McCLURE, Defendant.**

No. LR 61 C 182.

United States District Court
E. D. Arkansas, W. D.

Dec. 3, 1963.

———◆———

Robert J. White, of White & Young, Russellville, Ark., for plaintiffs.

W. Dane Clay, of Rose, Meek, House, Barron, Nash & Williamson, Little Rock, Ark., for defendant.

YOUNG, District Judge.

This is a diversity action brought by nine of the eighty-six creditors of Commodities, Inc. (hereinafter referred to as Commodities), a bankrupt corporation, against the principal officer-director-stockholder, Robert Y. McClure. In the complaint, plaintiffs alleged that Commodities became indebted to them and that the ensuing insolvency and inability of the corporation to pay its obligations to them was "caused and brought about by the negligence and mismanagement of its managing officer," the defendant. Plaintiffs further alleged that the "wrongful, unlawful, negligent and careless conduct" of the defendant was a "pretense * * * to obtain money and credit from suppliers with the intent * * * to avoid payment therefor." The case was tried before the Court and briefs were submitted from both sides in support of their respective contentions as to the relevant factual and legal issues involved.

Commodities was incorporated as an Arkansas corporation on January 9, 1957[1], and operated under the wing of McClure Gin Co. until sometime late in 1957 or early in 1958, at which time the corporate offices were moved from Dardanelle, Arkansas to Russellville, Arkansas. The move was brought about by the expansion of the operations of Commodities. Commodities had commenced operations with operating capital of $300.00. The financial statement prepared by Mr. Norman Crouch for the year ending March 31, 1958, reflected a gross income of $1,500,000 with a net profit of slightly less than $1,000.

The nature of the operations of Commodities was the buying and selling of commodities such as soybeans, fishmeal, poultry feeds, etc. However, corporate income was derived not only from the sale of commodities but also from the transportation of these commodities. The success of the operations depended on a big volume of sales and the constant hauling of loads by the trucks. A typical run of a truck was to pick up a load of soybean meal in Memphis to be delivered in Texas and there pick up fishmeal to be hauled to Minnesota, and there pick up feed to be hauled to the Gulf Coast, etc.

Because of the nature of the operations, Commodities was divided into a trading division, which handled the purchases and sales of commodities, and the trucking division, which handled the transportation of the commodities from the source of supply to the purchaser. The trading division was run by Mr. Bronson Woodworth from late 1958[2] up through May or June of 1959. The trucking division was run by Mr. Jack Presley from August or September 1958 to the date of the filing of bankruptcy of Commodities on September 26, 1959. Mr. Harley Woods and Mr. Tom Callins were both employed in the sales division, and Mr. Callins worked in the transportation division.

The books of Commodities were set up by Mr. Norman Crouch, who left his employment shortly thereafter. Considerable difficulty was encountered in obtaining competent employees to maintain the books. Mr. Tom Callins, Mr. Tom Loss and Miss Bonnie Harper maintained the books at different times. Miss Harper kept the books from January 1959 until the date of bankruptcy.

The defendant was the principal officer, director and stockholder of Commodities, Inc. The defendant testified that he had been in business since 1948; that he had experience in the gin and grain business; that he had experience in a managerial position; that he had been on the Board of Directors of Arkansas Valley Feed Mills for four or

---

[1] The Federal Income Tax Return for 1958 erroneously reflects the date of incorporation as April 1, 1958.

[2] Sometime between August and December, Mr. Woodworth became manager of the trading division. Previously, Mr. Cox had been in charge of this division.

five years; that he had borrowed money from lending institutions before; and that he understood how to read a balance sheet.

According to the testimony of Miss Harper, who went to work as a bookkeeper in January 1959, and who maintained the books until late September 1959, Commodities experienced financial difficulties for the duration of her employment. Her observation was based on the fact that the checks made by the corporation were repeatedly returned unpaid. She stated that she was directed by the defendant to write checks with insufficient funds, with the idea that in the few days interim Commodities would obtain the money from the accounts owing to Commodities.

Mr. Callins, who started to work in January 1959, testified that when he started to work the books reflected numerous transactions that did not show whether there had been any payment made by Commodities in the case of accounts payable, or whether there had been a collection in the case of accounts receivable. Mr. Callins advised the defendant at the time that the creditors were pressing for payment. Sometime during March or April of 1959, the defendant's wife started working on the books to determine what accounts were outstanding, and in some cases it was never determined whether there had been a collection.

Mr. Callins also testified that the defendant would come in for a while one day and a while the next day; but he was there more later than at first.

According to Mr. Jack Presley's testimony, the first indication of financial difficulties was not until August 1959, and prior to that time his division was in good financial condition; yet, he readily admitted that he did not know whether the trucks were earning a profit on their hauls. Obviously, he was not acquainted with the internal cash flow of the trading division, which was the life blood of the corporation. To a similar effect, Mr. Wood, a salesman from April 1, 1957 to September 6, 1959, was unaware of the financial difficulties; yet, he also was not acquainted with the internal books and records which reflected the financial condition of the trading division.

It clearly appears from the testimony of the defendant's wife, Mrs. McClure, that discrepancies on the books became apparent at least sometime in the spring of 1959, when she attempted to straighten out the books, and she was advised by Mr. Callins of a shortage of invoices, absence of any collections in some transactions, erroneous entries on the contracts, and missing weight tickets. On the other hand, the defendant testified that he was well versed on the maintenance of the records of Commodities and that he regarded the business as in a sound and solvent condition up until the time he was informed in June 1959 of the many unpaid accounts; and it was not until then that he ordered an internal audit to be performed in order to ascertain the existence of any uncollected accounts receivable. Although the internal audit of June 1959 revealed a $1,000 deficit, the defendant testified that he was not worried because he knew of another $14,000 account receivable which was not included on the audit and would make up the deficit.

All of the debts now sued on by the plaintiffs were incurred on or after June 27, 1959.

The defendant went on vacation sometime in August 1959, and he testified that before he left he had reason to believe that one of his employees had been guilty of improper practices.[3] In his own

3. This employee ceased work sometime during the latter part of May or the early part of June on account of poor health. However, his employment was not terminated until early August 1959. The defendant testified that he believed that the employee whom he suspected had collected funds due the company for his own use, and further that this employee had received "kick-backs" on some of the purchases from Commodities.

words, the defendant stated that he retained this individual whom he had suspected of improper practices since he " * * * had confidence in him as long as he was watched."

It was not until August 1959 that the defendant engaged a certified public accountant to attempt to run down the uncollected accounts receivable.[4] The certified public accountant compiled a list of unpaid accounts receivable in addition to those found in the internal audit of June 1959. This accountant testified at the trial that although the balance sheet of March 31, 1959 reflected that the corporation was insolvent by $704.67, the net deficiency in the capital accounts, any substantial collection of these unpaid accounts would make the company solvent.

According to the testimony of the certified public accountant who was employed by the plaintiffs sometime during the fall of 1959 to examine the books of Commodities, the books were inadequate to reflect the financial condition of the corporation. Many records were missing and the corporation, except for five months, showed an overdraft each month varying in amounts of $6,900 to $66,000. During the years 1957 and 1958, loans were made to McClure Gin Co., as well as to the defendant, without interest. Numerous erasures were noted on the financial records of Commodities. He stated that as of March 31, 1959 the balance sheet reflected that Commodities was insolvent.

At the close of the plaintiff's case, the defendant made a motion to dismiss, contending *inter alia,* that since the proof offered by plaintiff did not establish any fraud and only raised the question of negligence, the case should be dismissed since under Arkansas law there is no cause of action in favor of a creditor against a corporate officer-director of a bankrupt corporation for negligence and mismanagement unless suit is brought by the trustee in bankruptcy for the benefit of all the creditors, or unless there has been a showing that the trustee has refused to bring suit. Pursuant to the Court's reserving its ruling on this motion, the defendant presented its case, and the trial was concluded.

■ The rule in Arkansas with respect to the standard of care required by a corporate director in the management of corporate affairs appears to be the rule requiring ordinary care, as earlier announced in Briggs v. Spaulding, 141 U.S. 132, 152, 11 S.Ct. 924, 35 L.Ed. 662 (1891), and followed by the Arkansas Supreme Court in a case involving the alleged negligence of a bank director, Sternberg v. Blaine, 179 Ark. 448, 17 S.W.2d 286 (1929). This is the rule applied by the Court in Johnson v. Coleman, 179 Ark. 1087, 20 S.W.2d 186 (1929), a case involving the alleged negligence of a director of a mortgage company. In the Coleman case, the Court defined negligence of a corporate director as " * * * the failure to exercise ordinary care; such care as a man of ordinary prudence would exercise under similar circumstances." Therefore, it is this standard of ordinary care which should be applied.

In the case at bar, the defendant failed to exercise ordinary care in the operation of Commodities, Inc., because he did not exercise such care as a man of ordinary prudence would have exercised under similar circumstances. The business was grossly undercapitalized to such an extent that no ordinary prudent man would have attempted to conduct a similar operation. The defendant's own certified public accountant stated that the ratio of current assets to current liabili-

---

4. About the same time, some of the plaintiffs discussed with the defendant the possibility of Commodities satisfying the respective debts to them. Toward the latter part of August, the defendant had travelled to Morgan City, Louisiana, to see one of the plaintiffs, Hi-Pro Fish Products, who was the largest creditor of Commodities, and had given a check in part payment of the debt to Hi-Pro, but the check was returned unpaid.

ties should have run at least 1:1 or possibly 1¼:1. Yet the balance sheet for the year ending March 31, 1958 reflected a current ratio of almost 1:2, although the year's operations reflected a 1½ million dollar volume; and for the next year, when the business did a 3 million dollar volume, the current ratio was also 1:2. Even the defendant's own certified public accountant testified that the minimum adequate investment would have been $15,000; and he further stated that an investment from $15,000 to $50,000 ordinarily would have been expected, even in such a "truck brokerage" business. The defendant's total capital investment of $300.00 in such an operation is almost unbelievable. In addition, the corroborating evidence by the defendant's employees as to the constant bank overdrafts, the inadequately kept records, the many unknown and unpaid accounts, the interest-free loans made by the company to the McClure Gin Company and the defendant, the instructions given by the defendant to buy on credit so that the corporation could pay other debts, the defendant's own failure to give the business more time and attention, not only with regard to the unpaid accounts but also to the employee who was suspected of improper practices, constitute overwhelming proof of the defendant's negligence and mismanagement of Commodities, Inc., which ultimately resulted in the insolvency of the corporation.

Notwithstanding the aforegoing analysis of the evidence adduced at the trial of this case, the defendant has raised the contention that the plaintiffs do not have a right to maintain this action, and it is with some reluctance that the Court agrees with this contention.

Under § 70, sub. a(5) (6) of the National Bankruptcy Act, as amended, 11 U.S.C.A. § 110, sub. a(5), (6), the trustee-in-bankruptcy succeeds to any right of action the bankrupt corporation may have to recover damages for misconduct, mismanagement or neglect of duty by a corporate officer or director. He is the only proper party to sue on any such right of action, and creditors who sue must either join him or show that he was requested and refused to sue. 4 Collier, Bankruptcy, paragraph 1170.29 (3) (14th Rev.Ed. 1954); 3 Fletcher, Corporations § 1176 (Rev.Ed. 1947) (citing cases). The necessity for the rule is to assure fair and orderly administration of bankrupt estates. The only exception to this rule is for rights of action which, under applicable state law, may be enforced by the creditors personally without joinder of the corporation or its appropriate representative. 4 Collier, op. cit. supra paragraph 70.29(3) n. 40, 41. Therefore, it is clear that whether or not the plaintiffs have a right to maintain the action in the case at bar must be determined in accordance with the Arkansas law.

Admittedly, the question raised by the defendant has not been expressly decided by the Arkansas Supreme Court. However, from an examination of the authorities the conclusion is compelling that under the law of Arkansas there is no right of action by an individual creditor against a corporate director of an insolvent corporation for negligence and mismanagement unless the action is brought by the trustee-in-bankruptcy suing for the benefit of all the creditors, or unless the trustee has been requested to sue and he has refused. In the case at bar, there was no showing that the trustee-in-bankruptcy had been requested to sue and that he had refused.[5] Therefore, it follows that the plaintiffs had no right to maintain this action.

In a number of cases, the Arkansas Supreme Court has considered suits by creditors against bank directors for negligence and mismanagement. E. g., see Fletcher v. Eagle, 74 Ark. 585, 86 S.W. 810 (1905); Bailey v. O'Neal, 92 Ark.

---

5. Notwithstanding the fact that the trustee-in-bankruptcy testified as a witness at the trial, it was never established whether he had been requested to bring this action against the defendant.

**490**

327, 122 S.W. 503 (1909); Nedry v. Vaile, 109 Ark. 584, 160 S.W. 880 (1913); Bank of Des Arc v. Moody, 110 Ark. 39, 161 S.W. 134 (1913); Zimmerman v. Western & So. Fire Ins. Co., 121 Ark. 408, 181 S.W. 283 (1915); Bank of Commerce v. Goolsby, 129 Ark. 416, 196 S.W. 803 (1917); Creamery Pkg. Mfg. Co. v. Wilhite, 149 Ark. 576, 233 S.W. 710 (1921); Delony v. Dillard, 152 Ark. 159, 238 S.W. 12 (1922); Muller v. Planters' Bank & Trust Co., 169 Ark. 480, 275 S.W. 750 (1925); Ford v. Taylor, 176 Ark. 843, 4 S.W.2d 938 (1928); Sternberg v. Blaine, 179 Ark. 448, 17 S.W.2d 286 (1929); Paragould Land Co. v. Taylor, 178 Ark. 619, 11 S.W.2d 441 (1928); Milburn v. Martin, 190 Ark. 16, 76 S.W.2d 952 (1934). For an annotation collecting cases from other jurisdictions, see Annot., 50 A.L.R. 462 (1927).

It should be noted that direct actions by a creditor against a bank director for negligence and mismanagement were allowed in Arkansas prior to the adoption of the State Banking Act in 1913, Ark. Acts 1913, No. 113. E. g., see Bailey v. O'Neal, supra. Such direct actions were permitted by the Arkansas Corporation Code of 1869, Ark.Acts 1869, No. 92, Kirby's Digest § 863 (1904), and it was under Section 863 that the Arkansas Supreme Court permitted a direct action in Bailey v. O'Neal, supra. However, after the State Banking Act was adopted in 1913, the Arkansas Supreme Court in Creamery Pkg. & Mfg. Co. v. Wilhite, supra, and also in Delony v. Dillard, supra, construed Section 53 of the Banking Act, Crawford & Moses Digest § 719 (1921), and held that in a suit against a bank director for negligence and mismanagement the action must be brought by the State Bank Commissioner for the benefit of all the creditors, and an individual creditor could bring such suit only upon a showing that the State Bank Commissioner had been requested to sue and he had refused. Although this section has been amended, it remains substantially the same. Ark.Stat.Ann. § 67–607 (Repl. Vol. 1957).

While the requirement established in the Wilhite case and the Dillard case, i. e., that the creditor cannot sue individually unless the Bank Commissioner has been requested to sue and refused, is obviously not controlling in the case of private non-banking corporations, such as in the case at bar, the development of the law in the banking cases is certainly analogous to the development of the law applicable to private non-banking corporations with respect to the right of the corporate creditor to maintain this type of action. This is particularly true in Arkansas since this type of action against a bank director had its genesis under § 24 of the Corporation Code of 1869, Ark.Acts 1869, No. 92, and further since the standard of care required by a corporate director generally was borrowed by the Arkansas Supreme Court from the line of banking cases imposing this same standard upon a bank director. Indeed, the early corporate law for non-banking corporations and the banking law in Arkansas borrowed heavily from each other primarily because neither was well defined by appropriate statutes.

In Johnson v. Coleman, supra, an action was brought individually by two creditors of an insolvent corporation against the corporate director of a mortgage company for his alleged negligence and mismanagement. The Arkansas Supreme Court denied recovery against the director because the proof failed to establish negligence on the part of the director. While the right of the creditors individually to sue the director was not challenged, and while the case as reported does not so indicate, an examination of the files and transcript of this case which are on record reveals that the action was brought under the provisions of the Arkansas Corporation Code of 1869.[6]

6. Record, Vol. 1, Johnson v. Coleman, No. 1118, 179 Ark. 1087, Arkansas Supreme Court Library (Sept. 23, 1929).

The Arkansas Corporation Code of 1869, Ark.Acts 1869, No. 92, was repealed in 1927 by Ark.Acts 1927, No. 250, which was later repealed by Ark. Acts 1931, No. 255, the present Corporation Code in Arkansas. Section 24 of the Corporation Code of 1869, Kirby's Digest § 863 (1904), provided as follows:

"If the president, directors or secretary of any such corporation shall intentionally neglect or refuse to comply with the provisions of this act, and to perform the duties therein required of them respectively, such of them as so neglect or refuse shall be jointly and severally liable, in an action *founded on this statute,* for all debts of such corporation contracted during the period of any such neglect or refusal." (emphasis added)

It was this particular section which permitted an individual corporate creditor to sue a corporate director for neglect and mismanagement in Arkansas. However, the Corporation Code of 1927 and the Corporation Code of 1931, which is presently in effect, contain no comparable provision, nor does the currently proposed corporation code. The obvious inference is that such a cause of action in favor of the individual creditor no longer exists in Arkansas.

In an article by one of the draftsmen of the current corporation code, Meek, Changes Needed in the Present Arkansas Corporation Act, 10 Ark.L.Rev. 1 (1955), Mr. Harry Meek discussed the right of a corporate creditor to sue directors for acts of mismanagement and concluded as follows:

" * * * Under our present law, I don't think a corporate creditor could sue the directors for general acts of mismanagement—except possibly through a creditor's bill (filed on behalf of all creditors) if the corporation became insolvent. Of course, however, such a suit could be maintained by a receiver or trustee in bankruptcy."

The reasons for refusing to allow individual creditors to sue a corporate director of an insolvent corporation for neglect and mismanagement and requiring the trustee-in-bankruptcy to sue for the benefit of all the creditors seem sound. This not only avoids a multiplicity of suits but it also ultimately provides an orderly procedure by which relief can be obtained for all of the aggrieved creditors rather than a fortunate few who prosecute their cause to a termination first. However, it should be pointed out that, as Judge Miller observed in Henderson v. Rounds & Porter Lumber Co., 99 F.Supp. 376, 380 (W.D. Ark.1951), a corporate creditor does have an individual action for actual fraud perpetrated by the corporate director upon the creditor. See also Rounds & Porter Lbr. Co. v. Burns, 216 Ark. 288, 255 S.W.2d 1 (1949). The Henderson case must be distinguished from the case at bar since the proof here falls short of establishing fraud on the part of the defendant. On the contrary, the evidence adduced at the trial went solely to negligence and mismanagement, and it is on this theory that the plaintiff's case must be considered.

The plaintiff's argument that the defendant waived the defense that under Arkansas law the plaintiffs could not maintain their cause of action is wholly without merit. The plaintiff's complaint was not defective, nor subject to the defendant's motion prior to trial, since it alleged a cause of action by the corporate creditors on a theory of fraud, as well as a theory of negligence and mismanagement. However, when the plaintiff failed to prove fraud and the evidence tended only to establish a case of negligence and mismanagement, the motion to dismiss by the defendant at the close of the plaintiffs' evidence was both timely and proper.

It is therefore ordered that the complaint of the plaintiffs be dismissed.